We're going to have two lawyers arguing for the Epley's. All right, why don't you all step up, identify yourselves for the record. Good morning, Your Honor, it's Matthew Patterson on behalf of McGill Management. Patterson? Matthew Patterson, correct. Okay, good morning to each of you. We will allow about 20 minutes for argument today. So Mr. Boyle, you may save out some time for rebuttal. Mr. Braniff and Mr. Patterson, you can divide that time, however. All right? All right.  20 minutes each side, Your Honor? 20 minutes each side. So the two of you together have 20 minutes. So you can organize your time that way. Yes. Thank you. Mr. Boyle, you may proceed. May it please the Court, again, jury Boyle for the plaintiff. Excuse me. Cases like this involving a snow or a fall on ice are fraught with difficulty because our case law requires an identified defect for a fall, and the Snow and Ice Removal Act precludes claims for negligent removal of a natural accumulation. They're among the few categories of negligence cases where summary judgment is routinely granted. But this case involves neither a failure to identify the cause of the fall nor a natural accumulation. Your main claim is that there was a defective condition or negligent maintenance. Is that it? It was a defective condition. And then on the maintenance, that's a separate issue. Okay. That was that they had a duty to clear the ice, and they didn't. But that's a separate issue. Yes, sure. They're separate defendants. We will consider them each separately. Yes. Do we have an issue here with notice and what the notice provided? Not explicitly. Okay. But on the other hand, Gordon testified that even in the summer, the water would run onto the sidewalk. This was something that was apparent. I realize it's disputed. But in the winter. That's notice when he didn't tell anyone about it? How is that notice? He saw it in the summer. They knew. I mean, when. The fact that he knew about it is not notice. Notice must be disclosed to the parties that you're suing. So how did he ever advise them? He did not explicitly advise them of that. Did he implicitly advise them? He did not implicitly. Well, everybody who lived in that condo unit, they're all laid out the same, and the photographs are in the record. They know water runs downhill, and he'd seen it more than once. They saw it as well. Water running downhill? Are you saying that's some sort of subjective condition? Well, when you. Is there a case that says that? Well, if you run your downspouts in a manner, and that's Murphy Hilton, if you run your downspouts in a manner that they're going to form ice or water on a sidewalk, yes. In this case, there's actually no evidence that any ice ever formed, is there? There's no testimony in the record that says that there was ice formed. There's some testimony from your client that said he saw water flowing out of a downspout, but there's no testimony that ice ever formed there at any time. Well, there was definitely testimony that ice formed there on the day that he slipped and fell. That was disputed. But ice from what? It has to be an unnatural accumulation. Do you agree with that? I agree with that. Okay. Well, what was the testimony about the unnatural accumulation of ice? The testimony was that when Gordon fell, with his hands, he could feel the ice that he slipped on, and it was in exactly the same spot where he had seen the water runoff before. Are you saying that that's actually in his deposition, that he said that? Yes. No, that absolutely is in his deposition, Your Honor. All right. But you do agree that there was no testimony by anyone at any time that there was ice or any water flowing from that downspout in the winter or even on this day? Well, ice doesn't flow in the winter. Well, there wasn't any ice that was apparent from the downspout. I think he actually was asked that question. He said no. He didn't notice anything, any ice around the area of the downspout? Well, around the downspout itself. I mean, what happened here was it comes down into a downspout. I think there was testimony in this regard. Plaintiff did not see any evidence of runoff from the downspout on the day of his fall. That's in the record. That is correct. Oh. He was at work that day. He came home that evening. And so, no, he did not see the water running down from the downspout across the frozen turf onto the sidewalk that day. He was at work that day. When co-counsels get up, they're going to explain how the case you rely on is different. All right. So why don't you tell us how you believe that case supports your case? You mean Murphy Hill? Yes, of course. Well, Murphy Hill had a similar situation in the sense that it was an unnatural accumulation. The ice that formed on the surface where the plaintiff fell in that case came from a gutter, which is very similar to what happened here. And the water dripped off the gutter and froze on the surface where she slipped. Were there multiple witnesses in that Murphy case? There were multiple witnesses that had seen that exact thing before. So there was evidence of notice, too, wasn't there? Well, the evidence of notice was that I don't think... I thought one of the witnesses was like a town hall or board member or something. I'm not certain about that, Your Honor. Okay. But... Isn't it the woman who came, he called her when he fell? He called the woman who was on the board? Here, yes, definitely. And she testified there was no evidence of any ice around her near the downspout, didn't she? Well, she testified there was no ice on the sidewalk where he fell. Yeah. Oh, all right. Yeah, she testified that there was no ice on the sidewalk where he fell. All right. She lived just one or two doors down, I forget which, and that's why he called her because she was his neighbor. Did the trial court here indicate that your complaint didn't allege any defective condition? The trial court did say that. Yes. So let's talk about your complaint. I have it in front of me. Yes. Do you have it handy? I don't have it in front of me, I don't think. Well, maybe it's in my appendix. All right. I don't think so. Okay. I think I had to pull it out of the record. But my question is, you are familiar with it, though, aren't you? I am familiar. Maybe, you know, between this part of your argument later. But I'm not certain that, well, I don't see any allegation in there about a defective condition, and that was part of the reason that the court rejected, you know, your response that the summary judgment shouldn't have been granted. Where in your complaint did you allege a defective condition? I don't believe it is alleged in the complaint, Your Honor. The complaint was drafted by prior counsel. Okay. And, you know, the standard for summary judgment is pleadings, depositions, and affidavits. Did he ask, or she, to amend? If an amended complaint is necessary, I ask the court to order an amendment pursuant to Rule 362-F. Well, all right. What would be the addition that you would allege that you could actually prove? Exactly what's in Gordon's deposition. What is that? Well, what's in Gordon's deposition is that, number one, there was ice on that sidewalk. That's what caused him to slip. Sure. We know that there's testimony there was ice. There's testimony. But in order to – and you don't have to prove your case, we know, at summary judgment. You just have to establish each of the elements. But you do have to show here that there was a defective condition. You have to be able to complete it with facts. So what would those facts be other than Mr. Gordon's statement that he saw water in the summer? The facts are that he had seen water running exactly where that ice formed in the summer at least once, and he said he believed more than one occasion. And some of the evidence came from the defendants. I mean, they made an effort to show that McGill's obligation to shovel the walks was never triggered, and they submitted weather reports that showed there was indeed snow. Do you think there's any case law that says water coming from a downspout is a defective condition? I don't think there's a substantial difference between water leaking out of a gutter, as in Murphy-Hilton, and a downspout that feeds onto a sidewalk that people walk on. There is a factual difference, but it creates the same hazard, exactly the same hazard. Except that in Murphy there were a number of people that actually testified to that defective condition. Wasn't there testimony how the water pooled by multiple people? Yes, and we only have one witness here. Who never said the water pooled? I'm not sure if he said it pooled, but he definitely said it ran onto the sidewalk. Yeah, all right. He definitely said he ran onto the sidewalk. All right, well, let's move on to the other defendant, Notice. I'm sorry, Notice has to go to the condo, homeowners, whatever. Where's the Notice? The Notice is that it's apparent that your downspout has run onto the sidewalks. What case would you say that we could use to write the opinion that way? Well, again, in Murphy-Hilton, and correct me if I'm wrong, but I don't think anybody said that they notified the owner of that building on the day that it happened. Something you can see with your own eyes and that everybody can see with their eyes. Didn't they notify the president of the association when the incident happened in Murphy-Hilton? I'm not certain if they gave her explicit notice, but just like that case the president of the association lived right down the street, or just a couple doors down. In this case? In this case. So she lived there, and she would have seen it, too. She denied seeing it, in the summer or otherwise. But that's a disputed issue of fact. What about the other defendant, the snow plowing company? That's a little bit different, because that is based on their contract. Do we read all the provisions, or do we just look at one? You read all of them. All right. So we have a contract that says you come out when there's two inches or more of snow. And salting is an extra charge, and the record shows zero accumulation of snow. I think the day before and the day of. It wasn't zero. I thought it was .00. I thought that's what's in the record. What do you think it says? I don't remember. Was it two inches? Maybe we can have a common ground there. Two inches of snow? It was not two inches. All right. There was an accumulation the day before as well as the day of, and even the condo board member testified that there was snow on the grass. Are you saying, forgetting the other provision about access to the mailbox and another thing I forgot, are you suggesting that there was a duty triggered? Let's take the two inches or more. Was there a duty to go and plow? Under that provision alone, no. All right. Okay. So you do concede that. So we're at least sure now that there weren't two inches of snow that needed to be attended to. That is correct. That clause of the contract was not triggered. Okay. Was there a salting provision triggered? Was anybody asked to come out because of ice? No. All right. So then we're left with reading everything together. How do you argue that clearing or making sure that the mailboxes are clear trumps the duty of the two inches or the extra pay for salting? It's based on the language of the contract, Your Honor, and specifically the provision that provides that all fire hydrants and mailboxes will be kept accessible at all times as part of this contract. Okay. So what does that mean? Does it mean that even if there's not two inches of snow, the plowing company has to come out? That is correct, Your Honor. And how would they be notified? They undertook. This is their contract. I realize there's a dissonance between those two clauses, but they drafted this contract. How did the trial court interpret that? The trial court, in my opinion, just read this clause out of the contract. Okay. Well, what case would you give us that would suggest that there was an additional duty this particular day? Well, that's a question of contract law, Your Honor. When you have an ambiguity in the contract, and here you have a provision that says you're. . . Was all this argued at summary judgment now, that this contract was ambiguous? I don't know if it was explicitly argued, but I relied very heavily on this language. To say that the contract was ambiguous and, therefore, parole evidence could be used? I mean, were any of these things discussed at summary judgment? This was discussed at summary judgment. Is it in your brief? It is in my brief, although I didn't cite the parole evidence rule. Okay. What did you say? What I said was that this clause of the contract, all fire hydrants and mailboxes will be kept accessible at all times as part of this contract, is the controlling language. Sure, but you just said you argued it was ambiguous. Well, the defendants argue that the other clause controls, and we've got two conflicting clauses. Well, we have to read them all together. My question is, reading them all together, my question to you is, is that how do we get to a notification? What in the contract would suggest that they would come out on their own and start doing something? Well, again, it's the explicit undertaking of the contract. They were required to keep fire hydrants and mailboxes accessible with or without notice. And that makes sense. I don't know. I'd have to have some cases that would support your interpretation. I'm not sure where you're pulling this from. Well, the clauses are inconsistent. On the one hand, it says we show up under certain conditions. The other hand, it says we're going to do this always. So you're reading things, though, into what this means, that it means they have a duty to come out at all times. They should basically be sitting there and waiting to do something just in case, as opposed to the contract that says, whenever there's more than two inches, they don't have to get a call. They have to go. They're required, when there's more than two inches of accumulation, to go out to the location and file. They were in charge of the maintenance of this facility, and it is not at all uncommon for a maintenance firm to see somebody there. Yeah. Didn't the court really interpret the provision as making certain that snow and ice wouldn't prohibit somebody getting to the mailbox? I read it that way, that they have an obligation. I mean, the court said, based on everything that was in front of it, that the duty to keep it free was compliant. There wasn't a question of material fact under these circumstances. But it wasn't accessible. It wasn't accessible without walking on ice that made him fall. Okay. Well, I understand you're saying it wasn't accessible, but you'd have to be able to show it wasn't accessible due to an unnatural accumulation of ice. Do you think that there's a duty from anything in the contract for McGill to clear this? Even if they don't have two inches. And the language is, at all times. That's unqualified. That's very specific. I think they have a duty when there's more than two inches to make certain that people can get to the mailbox or go near the – oh, that the fire departments can get to the hydrants. They definitely have that duty. And that's qualified with conditions that, under certain circumstances, if there's more than two inches, they plow. If salt is requested, they will salt. But this clause, which is in a different part of the contract. Would you say this is any different than the usual snow plowing contract? Most of them include a two-inch accumulation, don't they? I think that's probably correct, but I can't say for sure. I haven't seen enough of these to make a general statement. In a nutshell, give us the duty that McGill has based upon your reading of this contract. Exactly what they wrote in their contract. All fire hydrants and mailboxes will be kept accessible at all times as part of the contract. Okay, so what is their duty? Their duty is to make sure that people can get to their mailbox. Okay. Now, are we throwing out the unnatural accumulation of ice, or do they have a duty to actually make sure that there's no ice of any kind, natural, unnatural, so that they should basically have a – you know, someone there to always be checking? If it were a natural accumulation of snow and ice, it would be governed by a different rule. It would be governed by the Snow and Ice Removal Act, and that would present a problem in recovery depending on the facts. Okay. Here, I guess we could sum it up with this. If you can't establish the unnatural accumulation, you agree there's no duty for McGill? That is correct. All right. Anything further at this time? We're going to give you time for rebuttal. In regards to their argument that the Snow and Removal Act says that you have to establish Wolfram Mountain for McGill to – I mean, for the snow removal company to be liable, where is the evidence of the Wolfram Mountain here? Well, we're arguing, Justice Reyes, that the Snow and Ice Removal Act doesn't apply to a natural accumulation caused by a defective condition on the property, and that was the holding of Murphy Hill. Your whole argument is an unnatural accumulation? That is correct, Your Honor. And that's why you rely on Murphy? That is correct. All right. Thank you, Mr. Boyle. Now we're going to hear from your two opponents. Who's going first? Your Honor, I'll go first. James Brannan for Woodstone Townhome Homeowners Association. Brannan, excuse me. With a T, I thought it was F. I'm sorry. All right, Mr. Brannan, go ahead. As you point out, Your Honor, the main issue here, not the only issue, is whether there was any evidence of an unnatural accumulation, because we have no duty to do anything with a natural accumulation. Well, what about counsel's argument that water coming from a downspout onto a sidewalk and then into some grass in a downhill manner is a defective condition? Your Honor, first of all, it's not a defective condition, but nonetheless there's no evidence here that that actually happened. In fact, his own client, the plaintiff, testified it didn't happen. He specifically said, he didn't say, I didn't remember, I didn't look. He specifically said, I did not see any sign of runoff from the gutter to where I fell. That precludes his theory. I mean, his whole theory is speculation, that that's where the water that created that ice came from is from the downspout. But he then went on to say, I didn't see any sign of that. I didn't see any sign of water coming from the downspout. And that's key. Well, he said he saw it in the summertime. True, true. That's a totally different situation, though, Your Honor. And why? Because it's rain instead of snow. It's liquid instead of ice. In the winter it's frozen. The only evidence in the record is that the temperatures were below freezing. So there's no melting going on, other than it may have been from the sun during the day when the sun was out. But nobody testified to that. No, true. But the only other possible source of this is from the sun and melting it. But that's still a natural – Someone would have had to have testified to that to even get it in this record. True. But even that would be a natural accumulation. We still wouldn't have any duty with regard to that anyway. Even if it came from water that created this little – we have no idea even how big the ice was. It could have been this much. It could have been that much. We have no idea. But the point is that even if it came from the grass, that's still a natural accumulation of snow and ice, creating a natural accumulation of snow and ice. It had to come from the roof. It had to come from the roof, melt off the roof, go into the gutters, and then down this downspout. It had to then go travel over a concrete slab or sidewalk that you get in the door. And then it had to go over at least 10 to 15 feet of grass. Can I ask you a question? Yeah. If you know. In this particular case, a lot of these downspouts that come from the gutters may cross over a sidewalk. But a lot of times there's an extension so that that water never, ever lands on the pavement. It just goes right to the grass. Do you know the situation here? Sure. Was this a downspout that did place water onto a sidewalk and then into grass? It went over. You have the public sidewalk, which Mr. Casper was walking on. Yeah. From there you have a walkway up to the door of the town hall. Yeah. There there's like a little jog in there into the door. The downspout from the garage comes down into like a little garden area where there were plants. From there it may flow over that approach sidewalk, but that's a private sidewalk, not a public one. He wasn't on that part of the block. If it does manage to flow over that part of the block, then it has from the photographs you can see it has another 10 to 15 feet of grass that it has to go through without either being soaked in or frozen before it reaches the sidewalk where he fell. I see. Okay. That's key because he said that in all that 10 to 15 feet of grass, he didn't see any sign of water flowing. And the evidence is undisputed that there was a coating of snow, and it was powdery snow, according to Mr. Casper himself. Powdery snow is frozen. I mean, we've all lived here for years. We know winters, right? We know that if it's melting, it's wet. It's not going to be powdery. Powdery water that's going to flow through a dusting of snow is going to leave some kind of a trace.  It has to leave a trail. He said there was none. There was none. I have a question regarding the ice itself. There's reference in the briefs about black ice. Is there any significance to that? I don't think so. I think it's just that that indicates how thin it was. It doesn't indicate how long it might have been there. No, because that can happen. The only reason it's black is because it's too thin to have any reflective quality to it from the light. Also, it was under snow, so we don't really know. There wasn't family black ice. It could have been something else. But nonetheless, there's no path between the gutter, downspout, and the place where he fell. Did you argue that the complaint was defective in terms of any suggestion that there was an allegation of a defective condition? I don't think that we raised the lack of any allegation in the complaint. It did surprise us as a deposition when he first started to try and raise the issue of a defect. That's why during our questioning we didn't ask him about it. Well, are there allegations that you're aware of in the complaint that have any suggestion of a defective condition? No, absolutely not. There are not. Well, isn't that a defect here? It is. You mean a defect in the complaint or a defect in the proof? Yes. It's both. A defect on the appeal issue. I thought in your complaint you have to frame the issues. That's true. And if you don't frame certain issues, you can't argue something that isn't framed by the court. Yeah. No, that's absolutely true. The trial judge said there were no allegations about a defective condition, but counsel is relying on a defective condition, is he not? He's relying on speculation about a defective condition. There's no evidence of that. His argument is that there is sufficient evidence of a defective condition to go to a jury. Right. Except that there's no allegation of that in the complaint that I'm aware of, and I was just curious what. That's right. You are absolutely correct. A defect is not an issue raised in the pleading, so he's trying to get outside of the pleading. I guess as an alternative, our position is, even if you do consider whether there was a defect, there's no evidence of any defect. All the evidence presented by the plaintiff about the downspout itself is that he went up to it a few feet away and looked at it, and that's it. There's no allegation of any code violation. There's no allegation that this was clogged. There's no allegation that it was placed defectively. It did what it was supposed to do. It was supposed to drain water off the roof. It was supposed to drain it over the grass. That's what cities and codes require now. They don't like it to go underneath the ground into the sewers. They want it to disperse over the ground. So what essentially he's asking us to do is to violate the code in that respect and put it underground so that it never flows over the grass, which is what it's designed to do. How do you distinguish the Murphy case? Your Honor, the Murphy case has no application to us at all. It did lay out a similar theory by the plaintiff about water running off and pooling in an accumulated area. And there was testimony about pooling, wasn't there? There was in the Murphy case, absolutely. Yes, that's what I'm talking about. None here. So legally that case is irrelevant to us in particular because all the Supreme Court decided in that case was an issue of interpretation of the Snow and Ice Removal Act. It laid out the plaintiff's theory, but the Supreme Court specifically said we are not going to decide, and it has not been decided, whether that theory works. It has not been decided and we are not going to decide whether the plaintiff has presented sufficient evidence to beat a motion for summary judgment. So that case has no application whatsoever to the question of natural versus unnatural accumulation. Even if you looked at the facts there, it is distinguishable on so many levels because they had at least three witnesses that talked about repeated melting and accumulation in a specific spot in where the plaintiff fell. And on the very day that the plaintiff fell in the Murphy case, in fact. So, in other words, there were people that saw the snow and ice melting and then accumulating and refreezing in the Murphy case. So that's totally distinguishable from here where there is no such evidence whatsoever. So we're still left with pure speculation. How can a jury decide, yeah, this came from the downspout. First of all, they'd have to disregard the plaintiff's own testimony. They'd have to disbelieve the plaintiff's own testimony. And then where do they go from there? What evidence is there in the record that this was from runoff? There is none. It was only a dusting of snow. The temperatures never got above freezing. In the summer, that has, first of all. Well, what about the notice? Well, that flows from the fact that all they have is a statement that water flows over the sidewalk in the summer. Now, we all know that part of the reason for that is, again, because it's liquid, and you've got inches worth of water, gallons and gallons of water, flowing very quickly over the grass, over the sidewalk. And if the sidewalk's built the way it's supposed to, then it flows over the sidewalk into the parkway and then into the street where it goes into the sewers. So that's exactly what the code requires and what it's supposed to do. But here, there's no evidence that this ever happened in the winter. There's no evidence that any snow accumulated to such a degree on the roofs, and then it melted in enough volume and quickly enough for it to flow out of the downspout, while the weather's freezing, by the way, in sufficient volumes, gallons and gallons all at the same time, where it could then flow past the grass onto the sidewalk. No evidence that that ever happened. And Ms. Corey, the association president, said not just that she didn't see ice on the sidewalk. She specifically said, I never saw that kind of water flow even in the summertime. I never saw any problem with the gutters, downspouts, or water flowing over the sidewalk. And there is no evidence in the record anywhere else that anybody ever advised the association in any way that it happened even in the summer. So if there's no notice of the summer, there's certainly no notice of the winter, because there's no evidence it ever happened in the winter. So we have no notice here whatsoever. Anything further? I was going to ask, in the record that's not clear, how close was the mailbox to this downspout? Well, it actually was a couple doors down, first of all, even on the sidewalk. But then the sidewalk itself was, like I said, from the photographs, at least 15 feet away from the downspout. So the mailbox, probably at least 30, 40 feet away from the downspout. And it wasn't in line with that downspout was a couple doors down. So it's not in line with the mailbox at all. And that goes to, I only want to address the contract in two ways. One is, we don't have any duty to remove natural accumulations. And the case law is very clear that just by entering into a contract with McGill, we did not undertake to remove natural accumulations or do anything, in fact. That's why we hired them. Whatever obligation there was under the contract was McGill's, not ours. And it does get to the mailbox. The mailbox was accessible at all times. That provision is, we're not going to pile up snow and cover the fire hydrants or the mailboxes. That's what the purpose of that provision was. Again, there's no evidence that this patch of ice. Is there any other reasonable interpretation of what Mr. Boyle is arguing? No. His interpretation would require the court to ignore the three paragraphs we cite and that you've referenced already in the argument about, we have to call them if we want them to come out and solve them. It only happens when there's more than two inches. And the contract provision specifically saying when they're done plowing, we all recognize there will be still a skim coating of ice on there. Yes. That's in the contract. So his interpretation is not just in conflict. It would require the court to ignore three entire paragraphs, and that's directly contrary to the rules of interpretation of the contract. So what he's doing is asking the court to disregard the law. So accessibility means that there won't be piles of snow or ice that was unnaturally accumulated. Wouldn't you agree? Yeah, I would totally agree. It has nothing to do with natural accumulations. Absolutely. Because otherwise, as you pointed out during his argument, we would have to be out there all the time throwing salt down, even for a small patch of ice. Well, maybe you would. Well, McGill would. If you paid them an extra charge. And, of course, they had no such duty because we never asked them to do that. All right. Thank you. Mr. Patterson. Good morning, Your Honors. May it please the Court. It's our position that the Snow and Ice Removal Act absolutely applies in this matter. We are a contracted party with a residential condominium association to perform snow and ice removal on the premises, exactly protected by the plain language of the statute. The plaintiff's complaint alleges negligent snow and ice removal, which is protected by the statute. There has been no allegations of willful and wanton conduct on the part of McGill. There is zero evidence in the record to indicate any kind of willful or wanton conduct. And as such, there is no liability on the part of McGill owed to the plaintiff here. Further, as it relates to the issue of notice, our notice is limited to that which we receive from Woodstone in circumstances where there is under two inches of snow. They have to call us out if they want some work provided on the premises. There is no indication in the record that there is any notice or request made by Woodstone to McGill to come and perform any kind of ice removal services or snow removal services on the day of the occurrence. It's strictly a situation where there was no notice actual on the part of McGill of any kind of, if we're going to call it an unnatural accumulation, which I believe, as has been established by argument thus far, that there really is not enough evidence to support an unnatural accumulation finding. But even if there is, there's not the requisite notice to put a duty on McGill in this particular instance. There's no evidence with regard to established constructive notice with regard to how long the ice patch was there or any kind of notice on the part of the plaintiff to any member of Woodstone or McGill regarding any kind of condition that he had observed in the past. He was, in fact, asked directly in his deposition, had he ever notified any member of Woodstone or McGill regarding any of the downspout issues he's alleging in his arguments today. What is your interpretation of the provision about accessibility? The hydrant and the mailboxes must be accessible at all times. Right. That is, again, must be read as part and parcel of the entire contract. We are only contracted to perform snow plowing on the premises. Any kind of ice removal on the premises is an extra charge as the request of Woodstone. Therefore, any kind of applicability of that clause would be in the context of snow plowing work. Not in the context of ice unless you were called out for that? Correct. How do you come to that interpretation? Well, that is the, again, in terms of voluntary undertakings, it's limited to the terms of the contract. Well, you're not, why are we talking about voluntary undertakings? It's a good point, Your Honor. I will step off from that argument. But again, as it pertains to ice removal, unless we are requested to perform ice removal at the mailbox itself by Woodstone, there's no duty on us to come out and perform ice removal services at that particular place or at that time. And besides, the plaintiff's argument with regard to accessibility kind of stretches what is accessible to the logical limit to an extent. He's trying to extend the definition of accessibility to anyone on the premises that has an intent to walk toward a mailbox. That is essentially his definition of accessibility as it pertains to this set of facts that's before the court. Any type of situation where an individual on the premises is going to walk to a mailbox and is unable to do so because of some kind of snow and ice on the premises, now we're in the situation where a McGill representative has to be on the property at all times, as we have discussed earlier, that that's going to lead to, or that is not what is contemplated in the contract and that's not what is required by Illinois law. And further, that's, again, the record is devoid of any kind of evidence that would indicate a duty on McGill for removing any kind of natural accumulation. And further, the record is devoid of any kind of evidence that is of an unnatural accumulation that would be triggering a duty under the contract of McGill. Well, talking about the particulars about ice, you're reading the contract is that other than a phone call or some notice that they want you to come out and salt, there would be no obligation to, on your own, or sua sponte, go and check to see if the mailboxes and the hydrants are free of unnatural accumulations of ice? Correct. It is essentially a two-inch threshold for any kind of service on the premises. The testimony from Woodstone's representative indicated that unless there is a two-inch snowfall or accumulation, I should say, that there is no duty on McGill to come out. Well, forgetting about the two-inch accumulation, let's say there was an ice storm. Your obligations are only triggered if you get a call to come out and salt. Isn't that correct? That is correct. Okay. So this other paragraph, you argue, when it's interpreted with the other provisions, simply means that you're not going to leave the hydrants or the mailbox unaccessible based on salting or plowing or whatever you do. It does not mean you have to go out there and check on your own. Correct. And for those reasons, the court should affirm the lower court's ruling on the motion for summary judgment. Okay. Unless there's anything further, I will. All right. Thank you. Thank you. All right. Mr. Boyle, a rebuttal. The difference between Murphy, Hilton, and Allen is the difference between an identified cause of the fall with an inference as to what caused the condition and an inference as to what caused the fall. The inference as to what caused the condition here, in one of the briefs from the defendants, they ridiculed Gordon for relying on the laws of physics. But that's exactly what applies here. Heat rises in a building. It will melt snow on a roof even when it's below freezing. And the defendants themselves acknowledged that on this day there was a period above freezing. So the laws of physics say that the water is going to run down this downspout. Is there anything in the record that you're talking about now, the law of physics, melting, rising? I mean, really, is there? Doesn't it have to be in the record? Well, Gordon did testify that the laws of physics, for instance, dictate that water runs. He did testify? Yes, he did, that the laws of physics dictate that water runs down hills. Oh, all right. Well, I think we can get that without Mr. Kasper's testimony. That is correct. And heat rises on buildings, as happened in Murphy-Hilton. Even though water's dripping from a downspout, it forms ice on a sidewalk. That's the law of physics as well. Another law of physics is that they're making a big deal out of the fact that, well, because water ran over that lawn in summer, that doesn't mean it runs in winter. But frozen soil is less porous than unfrozen soil. Those are laws of physics. Mr. Boyle? Yes. McGill, as one of their many arguments, argues that they are covered by the Snow and Ice Removal Act. Do you agree? This wasn't a natural accumulation. Okay. So, but if it were, are they covered? If it were a natural accumulation, their obligation, as stated by them in their contract, is unqualified by the other conditions stated in a separate section of the contract. And that language is unqualified. All fire hydrants and mailboxes will be kept accessible at all times as part of this contract. Well, their argument is that they're covered regardless and that you haven't alleged or shown any willful or wanton misconduct. We have not alleged or shown any willful or wanton misconduct, and we are alleging that this clause of their contract required them to keep that mailbox accessible. All right. Anything further you wish to add? Unless you have any questions. All right. Thank you both, all of you. The case was well-argued and well-briefed, and we will take it under advisement. And we'll call on.